UNITED STATES of America, Appellee,

v.

**Daniel Nelson SILVA, Appellant.**

No. 79–5197.

United States Court of Appeals,
Fourth Circuit.

Argued June 9, 1983.

Decided Oct. 1, 1984.

David P. McCann, Charleston, S.C., for appellant.

Susan Z. Hitt, Asst. U.S. Atty., Columbia, S.C. (Henry Dargan McMaster, U.S. Atty., Columbia, S.C., Samuel K. Morgan, Jr., Lexington, S.C., Third Year Law Student on brief), for appellee.

Before HALL and PHILLIPS, Circuit Judges, and BULLOCK,[*] District Judge.

BULLOCK, District Judge:

Appellant Silva was convicted of violations of 18 U.S.C. § 922(h), possession of a firearm by a convicted felon, and 18 U.S.C. § 1071, harboring and concealing a fugitive. On appeal, Silva makes numerous evidentiary and procedural challenges.

---

[*] Honorable Frank W. Bullock, Jr., United States District Judge for the Middle District of North Carolina, sitting by designation.

*Factual Statement*

On November 18, 1978, Robert Fieldmore Lewis, a convicted murderer, escaped from a Florida penitentiary. Later that evening, Lewis and Silva appeared together at the Florida motel room of Martha Ann Steinhorst, who had aided in Lewis's escape by providing him with a prison guard's uniform. The three watched the eleven o'clock news together, during which a report of Lewis's escape was telecast. Shortly thereafter, Silva left the motel room, while Lewis remained.

Two days later, on November 20, a federal warrant was issued in the Northern District of Florida for Lewis's arrest. Meanwhile, Silva and Lewis had embarked on separate paths which would ultimately meet in Santee, South Carolina.

On November 28, 1978, the FBI received information that Silva was to meet the fugitive at the Ramada Inn in Santee. On the basis of this information, the FBI assigned six agents, one posing as the desk clerk, to the motel. At approximately 2:30 a.m. on November 29, Appellant checked in under the name of George W. Allen. Before leaving the lobby, Appellant made a telephone call from the pay telephone there. Shortly thereafter, a truck left the fugitive in the motel parking lot.

Lewis was admitted to the Appellant's room, and a few moments later the FBI agents entered the room and arrested both men. After both were handcuffed, a search of one of the bags in the room uncovered two .38 caliber revolvers, ammunition, and materials for creating a disguise.

Silva, a previously convicted felon, was subsequently convicted of unlawful possession of a firearm in violation of 18 U.S.C. § 922(h) and harboring a fugitive in violation of 18 U.S.C. § 1071. A third count of the indictment, under 18 U.S.C. § 924, resulted in a jury verdict of not guilty.

I. *The Motion for Severance*

Silva first contends the district court erred in failing to grant his motion to sever the indictment for the firearms charge from the indictment for harboring a fugitive. Silva argues that since the firearms charge had as a necessary ingredient his prior felony conviction the jury was unable to consider the harboring charge without this prejudicial knowledge. Silva claims that had the charges been severed, the jury would never have obtained this information, since he did not testify in his defense and the evidence therefore would have been inadmissible for character or impeachment purposes. Three circuits have addressed this problem and have reached varying results. *United States v. Valentine,* 706 F.2d 282 (10th Cir.1983); *Panzavecchia v. Wainwright,* 658 F.2d 337 (5th Cir.1981); *United States v. Busic,* 587 F.2d 577 (3d Cir.1978), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981).

In *Busic,* defendant was tried on a number of charges, including receiving firearms in violation of 18 U.S.C. § 922(h). Busic argued that the trial court's failure to sever the § 922(h) charge resulted in the prejudicial admission of his prior felony conviction. The Third Circuit Court of Appeals found no error, since defendant had raised an entrapment defense which permitted introduction of the prior convictions to prove predisposition. The Third Circuit thus endorsed an independent admissibility test—if evidence of the prior conviction is admissible on the other counts standing alone, then consolidation is not improper and the defendant will not be prejudiced. If the evidence is inadmissible on one count of a multi-count indictment, however, severance will be required.

We find the *Busic* approach unwieldly at best. It will oftentimes be difficult to forecast, in advance of trial, the admissibility of prior felony convictions since their admissibility may hinge on the defendant's trial tactics. Defense counsel may not wish to tip his hand as to a possible entrapment defense, for example, or indicate his intention to put the defendant on the stand, thus "opening the door" for introduction of the prior conviction. This secrecy is his prerogative. A defendant is entitled to "shield the theory of his defense from the prosecu-

tor's scrutiny." *United States v. Brinkman,* 739 F.2d 977, 980 (4th Cir. July 26, 1984).

■ The Fifth Circuit took a more reasonable approach in *Panzavecchia v. Wainwright, supra.* That court was confronted with a habeas corpus proceeding involving the propriety of the joinder of an indictment for first degree murder with an indictment for possession of a firearm by a convicted felon under Florida law. Although the court found constitutional error in the joinder, it indicated that this was not an inexorable result.

> Had the two offenses been tried separately, the counterfeiting conviction would never be admitted in the murder trial. However, as it turned out, *the jury heard repeated references to the defendant's criminal past without any limiting instruction* to relate this evidence only to the firearm violation and to disregard it altogether in considering the murder count. The proper balance between judicial economy and the prejudicial effect of evidence of prior convictions was not struck in this instance. The prejudice which Florida and the federal courts have proscribed clearly existed and this prejudice rose to such a level as to make the petitioner's trial fundamentally unfair and in violation of the fourteenth amendment.

658 F.2d at 341 (footnote omitted) (emphasis added). *Accord United States v. Valentine, supra,* 706 F.2d at 290 n. 7;[1] *United States v. Roe,* 495 F.2d 600, 604 (10th Cir.), *cert. denied,* 419 U.S. 858, 95 S.Ct. 107, 42 L.Ed.2d 92 (1974).

■ Any prejudicial effect of the necessary introduction of the defendant's past conviction can, we feel, be avoided through the use of a limiting instruction. The trial judge repeatedly charged the jury to consider Silva's previous conviction only for the purposes of the firearms charge. We must presume that the jury heeded this instruction. *See Spencer v. Texas,* 385 U.S. 554, 561, 87 S.Ct. 648, 652, 17 L.Ed.2d 606 (1967); *Murray v. Superintendent,* 651 F.2d 451, 453–54 (6th Cir.1981).

Considerations of judicial economy reinforce our conclusion. Were Appellant to prevail in his plea that we create a *per se* rule that a charge under the firearms statute always be severed from any other criminal charge, duplicitous trials would be required. One found in the unlawful possession of a firearm will often be charged with another crime involving the use of that firearm. Requiring two trials, one for a charge which requires little more than proof of possession and the existence of the prior record, and one for the underlying criminal charge, would be unnecessarily redundant. *See United States v. Parodi,* 703 F.2d 768, 780 (4th Cir.1983). This is not to say that judicial economy is entitled to greater weight than defendant's right against self-incrimination.[2] We merely find that the use of a limiting instruction removes any constitutional infirmity.

## II. *Non-Disclosure of the Grand Jury Testimony*

In an effort to impeach the testimony of prosecution witness Martha Ann Steinhorst, Appellant's counsel subpoenaed her previous state grand jury testimony. The Assistant State Attorney for Duvall County, Florida, site of the grand jury proceed-

---

1. The Tenth Circuit's primary focus in *Valentine* was on whether defendant had been prejudiced by the introduction of his prior conviction as a part of the unsevered § 922(h) charge in a cocaine prosecution. The court noted that the prior conviction had not been given "unnecessary or undue emphasis at trial." 706 F.2d at 290. No details of the conviction had been introduced to the jury, and only brief mention of it had been made in closing argument. The court also recommended use of a limiting instruction.

2. In *Vines v. Muncy,* 553 F.2d 342, 347 (4th Cir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1977), this court noted: " '[T]he Federal Constitution ... does not guarantee trial procedures that are the best of all worlds, or that accord with the most enlightened ideas of students of the infant science of criminology, or even those that measure up to the individual predilections of members of this Court.' " (quoting *McGautha v. California,* 402 U.S. 183, 221, 91 S.Ct. 1454, 1474, 28 L.Ed.2d 711 [1971] ).

ings, appeared for the prosecution and testified that the grand jury testimony sought by Defendant was "of a highly sensitive nature" and related to on-going proceedings in the state of Florida.[3] He requested that the trial judge examine the grand jury minutes *in camera* to determine whether any inconsistencies existed between those proceedings and Steinhorst's in-court testimony. Chief Judge Simons agreed to the *in camera* inspection, with the consent of defense counsel. After a brief review of the thirty-nine page transcript, the trial judge reported that he found no substantial conflict in the two testimonies, although there were "minor differences as to times." Appellant contends that since the court indicated some discrepancies he should have been permitted a complete review of the transcript and allowed to recall the witness.

Had Steinhorst's testimony been given before a federal grand jury, we cannot doubt that it would have been error not to have required its disclosure. With the passage of the 1970 amendments to the Jencks Act, 18 U.S.C. § 3500, Congress mandated that federal grand jury testimony is to be turned over to the defendant upon request when the grand jury witness testifies at trial.

This transcript concerns a state proceeding in Florida, however, and it has been held that the Jencks Act has no application to statements made to state officials.[4] *United States v. Smith,* 433 F.2d 1266, 1269 (5th Cir.1970) (statement to state police officer not to a Government agent and therefore not within scope of Act), *cert.*

*denied,* 401 U.S. 977, 91 S.Ct. 1206, 28 L.Ed.2d 328 (1971). There is no evidence of close cooperation between the South Carolina prosecutors and the Florida grand jury so as to justify a finding that the statements were technically made to Government agents. *See United States v. Heath,* 580 F.2d 1011, 1019 n. 1 (10th Cir.1978), *cert. denied,* 439 U.S. 1075, 439 U.S. 1075, 59 L.Ed.2d 42 (1979). Moreover, we are bound by principles of comity to accord state grand jury proceedings at least a qualified privilege. *Socialist Workers Party v. Grubisic,* 619 F.2d 641, 643 (7th Cir.1980).

The United States Supreme Court has enunciated a tripartite test for determining when the veil surrounding grand jury proceedings may be lifted. In *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979), the Court stated that:

> Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.

*Id.* at 222, 99 S.Ct. at 1674. While the parties have not mentioned Rule 6(e) in their briefs, it is clearly the governing standard regarding the production of federal grand jury testimony, and we feel it provides an appropriate framework for analyzing the issue at hand.[5]

---

**3.** An issue the parties have not briefed is whether a South Carolina District Court may order a Florida grand jury to turn over material. We do not find it necessary to decide this issue, but note "[g]enerally, only the court that has jurisdiction over the grand jury has the authority to direct disclosure ...." *United States v. Penrod,* 609 F.2d 1092, 1097 n. 8 (4th Cir.1979), *cert. denied,* 446 U.S. 917, 100 S.Ct. 1850, 64 L.Ed.2d 271 (1980). *But see United States v. Derrick,* 507 F.2d 868, 870 (4th Cir.1974) (district judge in Eastern District of North Carolina should have ordered grand jury materials from Western District of Virginia turned over to defendants).

**4.** We would also note that there is no indication in the record that the Government was in pos-

session of the Florida grand jury material. The Jencks Act would therefore not apply. *United States v. Cagnina,* 697 F.2d 915, 922–23 (11th Cir.1983).

**5.** The converse of this situation was at issue in *Illinois v. Abbott & Associates,* 460 U.S. 557, 103 S.Ct. 1356, 75 L.Ed.2d 281 (1983), where a state prosecutor had moved for production of federal grand jury proceedings. The Attorney General of Illinois argued that under 15 U.S.C. § 15f(a) he was entitled to grand jury materials without meeting the *Douglas* factors. The Court held that "compli[ance] with the judicially-developed standards implementing Rule 6(e)" was required. *Id.* at 572, 103 S.Ct. at 1364, 75 L.Ed.2d at 293.

Regarding the first requirement, the Court has noted that the "typical showing of particularized need arises when a litigant seeks to use 'the grand jury transcript at the trial to impeach a witness ....'" *Id.* at 222 n. 12, 99 S.Ct. at 1674 n. 12 (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 [1958]).

Disagreement exists among the circuits regarding the required showing of particularized need when grand jury material is claimed to be necessary for impeachment purposes. This court has squarely held that "the mere *possibility* that [a witness's] testimony before a grand jury differed from his testimony at trial ... would be insufficient reason to pierce the veil of secrecy which protects the proceedings of such a body." *United States v. Chase*, 372 F.2d 453, 466 (4th Cir.), *cert. denied*, 387 U.S. 913, 87 S.Ct. 1701, 18 L.Ed.2d 635 (1967) (emphasis in original). A showing of particularized need continues to be necessary. *Bast v. United States*, 542 F.2d 893, 895 (4th Cir.1976). Other courts have done away with the requirement of particularized need in the impeachment context. In these jurisdictions, a defendant is entitled to a trial witness's previous grand jury testimony upon request. *United States v. Amabile*, 395 F.2d 47 (7th Cir.1968), *vacated and remanded sub nom. Giordano v. United States*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), *cert. denied*, 401 U.S. 924, 91 S.Ct. 868, 27 L.Ed.2d 828 (1971); *Cargill v. United States*, 381 F.2d 849 (10th Cir.1967), *cert. denied*, 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968); *United States v. Youngblood*, 379 F.2d 365 (2d Cir.1967).

■ Even if we were to assume that the possible impeachment value of Steinhorst's grand jury testimony obviated the requirement of a showing of particularized need, however, we do not find that this assumed need for disclosure outweighs the need for continued secrecy.

While the aura shrouding grand jury proceedings has perhaps become less opaque over the years, it is indisputable that there is still a substantial interest in maintaining the secrecy of those proceedings. The Supreme Court in *Douglas* enumerated a number of these reasons:

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment.

*Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 219, 99 S.Ct. 1667, 1673, 60 L.Ed.2d 156 (1979). Each of these reasons bears on the sanctity of an on-going grand jury investigation. Here, the Assistant State Attorney for the county in which the grand jury was sitting testified that the jury was still engaged in "highly sensitive" proceedings. In the cases which Appellant claims mandate disclosure of the grand jury proceedings, the grand jury had finished its deliberations, sharply diminishing the fear of any effect upon its ability to actively seek the truth. In *Dennis*, for example, seven years had elapsed between the activities of the grand jury and the trial testimony. *Dennis v. United States*, 384 U.S. 855, 872, 86 S.Ct. 1840, 1850, 16 L.Ed.2d 973 (1966). Where a grand jury is still deliberating, courts have held that "the reasons for grand jury secrecy ... apply with particular emphasis." *United States v. Northside Realty Associates (In re Grand Jury Proceedings)*, 613 F.2d 501, 506 (5th Cir.1980); *In re Miami Federal Grand Jury No. 79–8*, 478 F.Supp. 490, 493 (S.D.Fla.1979). *Cf. Wisconsin v. Schaffer*, 565 F.2d 961, 967 (7th Cir.1977) (once grand jury has completed its work, reasons for secrecy become less compelling). Disclosure of Mrs. Steinhorst's testimony might have had a distinct chilling effect on the desire of other witnesses to come forward,

as well as to testify "fully and frankly." It was not error to refuse to order production of the transcript of the Florida proceeding.

### III. *The Firearms Conviction under 18 U.S.C. § 922(h)*

██ Silva's arrest was accomplished in dramatic fashion. After bursting into his motel room armed with shotguns, FBI agents handcuffed both Silva and Lewis behind their backs. As they sat on the motel room beds, Agent Calhoon picked up a locked zippered bag, which, due to its weight, he concluded might have weapons in it. He asked Defendant if he had a key to the bag. Defendant indicated the key was in his pocket, whereupon the agent removed the key, opened the bag, and found two pistols and materials for creating a disguise which were introduced into evidence at trial as part of the prosecution's case. Silva made a motion to suppress the evidence at trial, which was denied. Silva charges that this denial was error.

We are of the opinion that any objections Silva may have to the validity of this search and seizure are disposed of by this court's recent *en banc* opinions in *United States v. Litman*, 739 F.2d 137 (4th Cir. 1984), and *United States v. Porter*, 738 F.2d 622 (4th Cir.1984). There, relying on the United States Supreme Court's decision in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), we held that "a lawful custodial arrest justifies a contemporaneous search without a warrant of the person arrested and the immediately surrounding area." *Porter, supra*, at 627.[6] There can be no dispute that the zippered bag was in the immediately surrounding area and that it was searched contemporaneously with the arrest. It was not error for the trial court to deny the motion to suppress its contents.

██ Appellant also challenges the firearms conviction by contending that the government did not adequately prove his prior conviction, since the prison record on which it relied was in the name of Daniel M elson Silva rather than Daniel Nelson Silva. The custodian of the criminal records of Duvall County, Florida, produced and identified at trial a document indicating that a Daniel Melson Silva was convicted of breaking and entering with the intent to commit a felony and sentenced to ten years in prison. He further identified the Defendant as being "Mr. Silva" and remembered him as having been in the Florida prison system.

We have little doubt that Daniel Melson Silva and Daniel Nelson Silva are one and the same person, and that the discrepancy in the middle name was created by the slip of a typist's finger.[7] The trial court prop-

---

6. Appellant has not contended that the FBI did not have probable cause for his arrest. Such an argument would fail. The FBI office in Jacksonville, Florida, had received information from a confidential informant, which it relayed to the arresting agents in South Carolina, that Silva was to meet the fugitive at the Ramada Inn in Santee, South Carolina, on the night of the arrest. The information included a physical description of Silva, the clothes he was wearing, and a description of the automobile he would be driving. Agents located the automobile on the interstate highway south of Santee and followed it until Silva stopped at a service station. Another agent also pulled into the service station, engaged the attendant in conversation, and observed and identified both Silva and his automobile. An agent posing as a desk clerk at the Ramada Inn also identified Silva and his automobile when he arrived, and assigned him to a pre-arranged room. The FBI also had information about the fugitive, including photos, a physical description, and a description of the clothes

he was wearing. The fugitive was observed being dropped off at the motel and going to Silva's room. His physical appearance, including his clothes, matched that which had been given to the FBI. Agents in an adjoining room overheard conversations between the fugitive and Silva which further confirmed their identity. Thus the FBI agents themselves independently confirmed as true every fact that the informant had supplied to the Florida office and which had been relayed to them. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Porter, supra*. And, of course, Silva was engaged in "harboring" the fugitive when the FBI entered the motel room and arrested them.

7. The ease with which such a minor error can be made is illustrated by Appellant's own brief in this court, on which his name appears as Daniel Neslon Silva.

848

erly rejected Appellant's motion to exclude the prison record on the ground that it was not the record of Daniel Nelson Silva.

IV. *The Harboring Conviction Under 18 U.S.C. § 1071*

■ Conviction under the harboring statute, 18 U.S.C. § 1071, requires proof of four essential elements. First, proof that a federal warrant had been issued for the fugitive's arrest. Second, that the Appellant had knowledge that a warrant had been issued for Lewis's arrest. Third, that the Appellant actually harbored or concealed Lewis. Finally, that Appellant intended to prevent Lewis's discovery or arrest. Appellant claims that the government failed to satisfy three of these required elements.

■ Appellant correctly points out in his brief that the government must prove the issuance of a warrant as an essential element of its case under 18 U.S.C. § 1071. Appellant claims that the government established the issuance of the warrant through inadmissible hearsay and therefore failed to establish an essential element of its case against him. We find this contention to be without merit. While the warrant itself was not introduced into evidence, Agent Calhoon testified that as a result of his own investigation he determined that Lewis "had escaped from death row of the Florida State Penitentiary and was wanted for unlawful flight to avoid confinement for the crime of murder." While it certainly would have been desirable to have introduced the warrant itself into evidence, we find that the existence of the warrant was properly placed before the jury.

■ Turning next to the requirement of knowledge of a federal warrant, it is well established that the government may prove knowledge of a warrant by inference. *See United States v. Hogg,* 670 F.2d 1358, 1361–62 (4th Cir.1982); *United States v. Kutas,* 542 F.2d 527, 528 (9th Cir.1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977); *United States v. Giampa,* 290 F.2d 83, 84 (2d Cir.1961). It is equally well established that in consider-

ing the sufficiency of the evidence, we are bound to view it in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Sherman,* 421 F.2d 198, 199 (4th Cir.), *cert. denied,* 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970).

Cases considering the knowledge requirement have fallen into three categories. In the first, there has been direct evidence that the defendant was aware that a warrant had been issued for the capture of the fugitive. *See, e.g., United States v. Hash,* 688 F.2d 49, 52 (8th Cir.1982); *United States v. Arguelles,* 594 F.2d 109, 111 (5th Cir.), *cert. denied,* 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979). The second category has inferred knowledge from the very act of harboring itself. *See, e.g., United States v. Giampa,* 290 F.2d 83, 84–85 (2d Cir.1961). In the final category, the actions of the defendant have been found insufficient to impute the knowledge of a warrant. *See, e.g., United States v. Hogg,* 670 F.2d 1358, 1361–62 (4th Cir.1982).

■ This case falls in the middle group. There was sufficient evidence before the jury for them to infer that Silva was aware that a warrant had been issued for Lewis's arrest. Mrs. Steinhorst testified that shortly after Lewis's escape she, the fugitive, and Silva sat and watched a news report detailing Lewis's escape. Thus, Silva was certainly aware that Lewis had recently escaped from prison. As someone who had served time himself, we find no injustice in inferring that Silva was aware that warrants generally issue for the recapture of escaped prisoners. While Silva's conduct at this stage cannot be considered violative of the statute, since no warrant had yet issued, it is certainly relevant regarding his state of mind.

Conduct after the issuance of the warrant establishes an inference that Silva knew a warrant had been issued. For no apparent reason, Silva traveled from Jacksonville to Santee, crossing two state lines, and then felt it necessary to check into a

motel under an assumed name. Silva then used a pay telephone to call the house where Lewis was hiding, shortly after which Lewis appeared at the motel. Upon Lewis's arrival at the motel Lewis told Silva, *"They are looking for me* with a description of clean shaven. I'm trying to grow a beard." (emphasis added). Silva was already well prepared to aid Lewis in his efforts to evade "them." The Appellant was found in possession of wigs and other materials for making a disguise, as well as two handguns. The jury could reasonably infer that these materials were for Lewis's benefit, for the fugitive inquired what Silva had brought him. These statements were overheard by the FBI agents in the next room. Silva was clearly aware that someone was pursuing Lewis, and we find a strong inference that he knew this was the law. *See United States v. Kutas*, 542 F.2d 527, 528 (9th Cir.1976) (harboring conviction affirmed where third party told fugitive, in defendant's presence, "I don't think they are going to be looking for you, because everybody is looking for Hearst."). Silva's covert actions are certainly not the acts of one trying to help an innocent friend. They reek of an attempt to deceive the law. We accordingly find that there was sufficient evidence from which the jury could have inferred that Silva possessed the requisite knowledge that a federal warrant had been issued for Lewis's arrest.

■ The next question raised on appeal is whether Silva actually "harbored and concealed" Lewis as those terms have been defined under 18 U.S.C. § 1071. Congress's use of these terms is indicative that it did not intend to proscribe all forms of aid to a fugitive. *United States v. Foy*, 416 F.2d 940, 941 (7th Cir.1969); *United States v. Shapiro*, 113 F.2d 891, 892–93 (2d Cir.1940) (predecessor statute). Supplying financial assistance to the fugitive has been held not to rise to the level of harboring or concealing. *Id.* Nor has the failure to disclose the fugitive's location been so construed. *United States v. Foy, supra.* False statements to law enforcement officers regarding contact with the fugitive

have also been found to lie without the scope of the statute. *United States v. Magness*, 456 F.2d 976, 978 (9th Cir.1972). What is generally required to make out a violation of the statute is "any physical act of providing assistance, including food, shelter, and other assistance to aid the prisoner in avoiding detection and apprehension." *United States v. Kutas*, 542 F.2d 527, 528 (9th Cir.1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977) (18 U.S.C. § 1072 case).

■ Here we find the sort of active conduct which will make out a violation of the harboring statute. Silva had rented a motel room under an assumed name, at which the fugitive appeared with his possessions after being telephoned by Silva. From this evidence the jury was certainly entitled to draw an inference that the fugitive was to stay with Silva. This is the type of active conduct which indicates concealment. *See United States v. Whitman*, 480 F.2d 1028, 1030 (6th Cir.), *cert. denied*, 414 U.S. 1026, 94 S.Ct. 453, 38 L.Ed.2d 318 (1973); *United States v. Thornton*, 178 F.Supp. 42, 43 (E.D.N.Y.1959). Silva was also in possession of guns and disguises which the jury might have inferred were for the fugitive's benefit. This is clearly the type of assistance which would aid a fugitive in "avoiding detection and apprehension."

Appellant makes much of the fact that he and the fugitive were together in the motel room for only five minutes before the FBI entered. His contention appears to be that this is insufficient time for one to engage in the acts of harboring or concealing proscribed by the statute. But Appellant's conduct in this case had been well planned over the space of several days. He had been with the escapee on the day of the escape, and there was evidence that Lewis had attempted to contact him during his flight from the law. It was certainly not mere happenstance that the two met again. This time the fugitive had been furtively deposited at the motel, after a telephone call by Appellant. Lewis knew

exactly which room to go to and inquired "what did you bring me?" The meeting was the end product of a well thought out plan to elude the FBI agents pursuing the fugitive. That they spent only a few moments in each other's presence is irrelevant. Had the FBI waited several hours to establish the contact between Appellant and the fugitive which Appellant claims is necessary, they would have risked their escape.

### V. *Alleged Prosecutorial Misconduct*

Silva also claims that the trial court erred in refusing to grant a mistrial on the grounds of alleged prosecutorial misconduct. Our task in determining the nature of this alleged misconduct is complicated by the loss of the transcript of the closing arguments, where the alleged misstatements were made. Pursuant to Rule 10(c), Fed.R.App.P., the parties recreated the record according to their own recollection, and we must determine the existence of any misconduct from this reconstruction.

■ The first prejudicial comment Appellant claims required a mistrial is the prosecutor's statement that the FBI Agents were "agents of the people," and, if the jury did not believe them, they should "cut Silva loose." The prosecutor denied using these exact words, but in any event we do not find reversible error. This is not a case where the prosecutor has improperly vouched for the credibility of his witnesses. *See, e.g., United States v. Modica,* 663 F.2d 1173, 1178–79 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *United States v. Weinrich,* 586 F.2d 481, 496–97 (5th Cir.1978), *cert. denied,* 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979). While the language is somewhat inflammatory, *see United States v. Passero,* 290 F.2d 238, 243 (2d Cir.), *cert. denied,* 368 U.S. 819, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), defense counsel admitted making a number of statements, in his own closing argument, indicating that the testimony of the FBI agents was "inaccurate and not complete." There is some indication that the actual language was that the Government had presented a "half-baked" case.

Under these circumstances, the prosecutor's response was permissible rebuttal. *See United States v. Harrison,* 716 F.2d 1050, 1051 (4th Cir.1983); *United States v. Smith,* 700 F.2d 627, 633–34 (11th Cir. 1983); *United States v. Perry,* 643 F.2d 38, 51 (2d Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981); *United States v. Hiett,* 581 F.2d 1199, 1204 (5th Cir.1978); *United States v. Hoskins,* 446 F.2d 564, 565 (9th Cir.1971).

■ Appellant also claims that the prosecutor's statement to the jury that they might infer Silva's intention to use his car to transport Lewis was unsupported by the record and therefore prejudicial. We find no merit in this contention and feel this was a reasonable inference for the prosecutor to suggest to the jury. Lewis was often driven about by others after his escape. Silva himself drove Lewis to meet Steinhorst. Steinhorst then drove him to Birmingham, Alabama, and Laury Dan Dyches drove him from Pineville, South Carolina, to Santee.

There was apparently only one car available to the fugitive at the motel in Santee, and that was Silva's. Lewis had no other means of transportation, and it may reasonably be inferred that Silva expected to be his driver, particularly since Silva had driven him in the past. One fleeing from the law would understandably avoid the exposure of public transportation. This was not improper argument based on the facts before us. As the trial judge instructed the jury, it was not evidence.

### VI. *Jury Instruction*

■ Silva's final complaint is directed against the jury charge given by the trial judge, which he contends violates the mandate of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The charge read, in pertinent part:

> *It is reasonable to infer* that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. So unless the contrary appears from the evidence you, the jury, *may draw the inference* that the

Defendant intended all of the consequences which one standing in like circumstances and possessing like knowledge, should reasonably have expected to result from any act knowingly done or knowingly omitted by the Defendant. (emphasis added).

A point the Appellant has wisely failed to raise, and one the Appellee has inexplicably ignored, is defense counsel's failure to object to the jury charge at trial. As the United States Supreme Court stated in *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977), "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Only "plain error" can attract this court's attention on appeal to an unchallenged instruction. *United States v. McCaskill*, 676 F.2d 995, 997 (4th Cir.), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 381, 74 L.Ed.2d 513 (1982); *United States v. Curry*, 512 F.2d 1299, 1303 (4th Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975). Although an appellate court may, in its discretion, decline to consider even "plain error," *United States v. Ostendorff*, 371 F.2d 729, 731 (4th Cir.), *cert. denied*, 386 U.S. 982, 87 S.Ct. 1286, 18 L.Ed.2d 229 (1967), this court feels compelled to examine Appellant's contention because of the recent constitutional gloss placed on presumptions in jury charges by the Supreme Court. *See Connecticut v. Johnson*, 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983); *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

In *Sandstrom*, the Supreme Court held unconstitutional for due process reasons a charge which the jury might have viewed as creating either a conclusive presumption or a burden-shifting presumption on the issue of intent. The charge there included the statement that "[t]he law *presumes* that a person intends the ordinary consequences of his voluntary acts." *Id.* at 513, 99 S.Ct. at 2453 (emphasis added). The charge in question here, however, is couched in far more precatory language. Such phrasing removes any constitutional infirmity for it describes only a *permissive* inference. *Hardy v. United States*, 691 F.2d 39, 42 (1st Cir.1982); *Lamb v. Jernigan*, 683 F.2d 1332, 1340 (11th Cir.1982), *cert. denied*, 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983); *Rivera v. Coombe*, 683 F.2d 697, 700–01 (2d Cir.1982); *Jacks v. Duckworth*, 651 F.2d 480, 486–87 (7th Cir. 1981), *cert. denied*, 454 U.S. 1147, 102 S.Ct. 1010, 71 L.Ed.2d 300 (1982); *United States v. Ming Sen Shiue*, 650 F.2d 919, 924 (8th Cir.1981); *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir.), *cert. denied*, 454 U.S. 1127, 102 S.Ct. 979, 71 L.Ed.2d 115 (1981); *United States v. Ogle*, 613 F.2d 233, 242–43 (10th Cir.1979), *cert. denied*, 449 U.S. 825, 101 S.Ct. 87, 66 L.Ed.2d 28 (1980); *United States v. White*, 611 F.2d 531, 538–39 & n. 8 (5th Cir.), *cert. denied*, 446 U.S. 992, 100 S.Ct. 2978, 64 L.Ed.2d 849 (1980).

The *Sandstrom* jury was not told that they could, if they wished, conclude that a person intends the consequences of his voluntary acts. They were charged instead that the law presumed this. The mandatory quality of the instruction was its constitutional downfall. 442 U.S. at 515, 99 S.Ct. at 2454. In his concurrence, Justice Rehnquist noted "surely if this charge had ... 'merely described a permissive inference,' ... it could not conceivably have run afoul" of constitutional guidelines. *Id.* at 527, 99 S.Ct. at 2454. The charge in question here diverges sharply from the one found infirm in *Sandstrom*. It speaks in terms of reasonable and permissible inferences, and it therefore shifted no burden.

The more glaring deficiency in this charge, which Appellant has not attacked, is the use of the language "unless the contrary appears from the evidence." Three circuits have entirely banned the use of language of this type in jury charges on intent. *Jacks v. Duckworth*, 651 F.2d 480, 486 n. 5 (7th Cir.1981), *cert. denied*, 454 U.S. 1147, 102 S.Ct. 1010, 71 L.Ed.2d 300 (1982); *United States v. Reeves*, 594 F.2d 536, 540 (6th Cir.), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979); *United States v. Garrett*, 574 F.2d 778, 782 (3d Cir.), *cert. denied*, 436 U.S. 919, 98

852

S.Ct. 2265, 56 L.Ed.2d 759 (1978). Another has indicated that it will not read the instructions as a whole in order to uphold such a charge. *United States v. Chiantese,* 560 F.2d 1244, 1255 (5th Cir.1977) (en banc), remanded 582 F.2d 974 (5th Cir. 1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979). Others have found its use to be reversible error in certain cases. *See, e.g., United States v. Barash,* 365 F.2d 395, 402–03 (2d Cir.1966), *cert. denied,* 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969). While other circuits have applied the harmless error rule to the giving of such a charge, they have condemned its giving as "an invitation to reversal," *Cohen v. United States,* 378 F.2d 751, 755 (9th Cir.1967), *cert. denied,* 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967), or "a dangerous practice." *United States v. Diggs,* 527 F.2d 509, 515 (8th Cir.1975).[8] Still another circuit has criticized this language as "confusing, clumsy, or unnecessary, if not prejudicial." *McCarty v. United States,* 409 F.2d 793, 800 (10th Cir.), *cert. denied,* 396 U.S. 836, 90 S.Ct. 95, 24 L.Ed.2d 87 (1969). This Circuit's only consideration of this language came in *United States v. Wilkins,* 385 F.2d 465 (4th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1144 (1968), well before the majority of decisions condemning it. While we implicitly recognized the undesirability of this language, we affirmed after reviewing the instructions in their entirety. *Id.* at 473–74.

The vice of the "unless the contrary appears from the evidence" language is the possibility that the jury may view it as encouragement to find the requisite intent upon the defendant's failure to present evidence. *See Garrett, supra,* 574 F.2d at 782; *Mann v. United States,* 319 F.2d 404, 409 (5th Cir.1963), *cert. denied,* 375 U.S.

986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964). In other words, this language implies that the defendant must put on rebutting evidence. *Washington v. Harris,* 650 F.2d 447, 453 (2d Cir.1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1455, 71 L.Ed.2d 666 (1982). Despite the deficiencies of this language, we do not find them sufficient to require reversal on the facts of this case.

It is well established "that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). Such an approach has consistently been applied by this court in reviewing challenged jury instructions.[9] *See, e.g., United States v. Walker,* 677 F.2d 1014, 1017 n. 3 (4th Cir. 1982); *United States v. Lopez,* 611 F.2d 44, 47 (4th Cir.1979); *United States v. Atkinson,* 512 F.2d 1235, 1239 (4th Cir.1975). As we stated in *Wilkins, supra,* "[i]t seems highly improbable that the jury would pick out and focus its attention on one particular clause and abstract the notion that the defendant had the burden of proof to introduce evidence to prove he did not intend the natural and probable consequences of his acts." 385 F.2d at 473.

Any prejudice caused by the questioned portion of the charge was ameliorated entirely by the remainder of the instructions. The trial judge repeatedly stressed that the prosecution was required to prove every element of its case beyond a reasonable doubt. We thus decline to overturn Silva's conviction on the basis of *Sandstrom.*

**AFFIRMED.**

---

**8.** The *Cohen* and *Diggs* courts were discussing the intent charge as a whole, which included the presumptive language found unconstitutional in *Sandstrom.*

**9.** Courts have continued to apply this approach since the *Sandstrom* decision. *Connecticut v. Johnson,* 460 U.S. 73, 80, 103 S.Ct. 969, 974, 74 L.Ed.2d 823, 830 (1983); *Brayboy v. Scully,* 695

F.2d 62, 66 (2d Cir.1982), *cert. denied,* 460 U.S. 1055, 103 S.Ct. 1505, 75 L.Ed.2d 935 (1983); *Lamb v. Jernigan,* 683 F.2d 1332, 1339 (11th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983); *Jacks v. Duckworth,* 651 F.2d 480, 486–87 (7th Cir.1981), *cert. denied,* 454 U.S. 1147, 102 S.Ct. 1010, 71 L.Ed.2d 300 (1982).