986 F.2d 1416
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Tyrone L. HARRIS, a/k/a Lawrence Harris Tyrone, Defendant-Appellant.
 No. 92-5088.
 United States Court of Appeals,
Fourth Circuit.
 Argued: October 30, 1992
Decided: February 18, 1993
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Newport News. J. Calvitt Clarke, Jr., Senior District Judge. (CR-91-65-NN)
 Argued: Robert Bryan Rigney, Moody, Strople & Kloeppel, Ltd., Portsmouth, Virginia, for Appellant.
 Laura Marie Everhart, Assistant United States Attorney, Norfolk, Virginia, for Appellee.
 On Brief: Richard Cullen, United States Attorney, Norfolk, Virginia, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 PER CURIAM:
 
 
 1
 The appellant, Tyrone Harris, was convicted and sentenced under four counts of a six-count indictment that charged him and one Blake with various firearms offenses. Specifically, he was found guilty of one count of conspiracy to violate federal firearms laws, two counts of causing false statements to be made to a federally licensed firearms dealer, and one count of possession of a firearm by a convicted felon. Harris challenges on appeal the evidence admitted at trial, the district court's failure to sever his counts, the district court's jury instructions, and the sufficiency of the evidence used to convict him. We find no error and affirm.
 
 
 2
 On August 27, 1991, Harris introduced the codefendant Joseph Blake to his friend Veronica Montgomery. Blake was a resident of New York who was visiting Harris in Virginia. Later that evening, Blake asked Miss Montgomery if she would do him a favor the following day. He was not specific as to the nature of the favor, but indicated that he would discuss it further the next day.
 
 
 3
 That same day, Harris met with two other friends, Mary Sawyer and Barbara Graves, who had been purchasing crack cocaine from him. These transactions took place in the Twin Canals section of Virginia Beach, Virginia. Both Miss Sawyer and Miss Graves met with Harris in Twin Canals that day to buy drugs from him. During the transaction, Harris asked Miss Sawyer to assist him in renting a car, which she did. Harris told Miss Sawyer and Miss Graves at that time that he planned to use the car to go to New York to purchase drugs. He later borrowed Miss Sawyer's personal car, and recruited Miss Graves to drive the rental car to New York.
 
 
 4
 The following day, August 28, 1991, Harris and Blake arrived at Miss Montgomery's house and asked her to accompany them to a Western Union near her home. Harris was at this time driving the car he had asked Miss Sawyer to rent for him on August 27th. After visiting one gun store nearby, Harris, Blake and Miss Montgomery all went to the Western Union where they picked up some cash. Next, they traveled to the Peninsula. During this drive, Miss Montgomery realized that Harris and Blake needed her to purchase firearms because they lacked the proper identification to purchase firearms themselves.
 
 
 5
 The three drove to various gun stores on the Peninsula, making the final decision to purchase firearms at the Mercury Gun Shop in Hampton. All three went into the shop. Blake selected six firearms and provided money for Miss Montgomery to make the purchase. He did not have sufficient cash for all six guns, so he borrowed money from Harris to complete the transaction. Meanwhile, Miss Montgomery filled out the Alcohol, Tobacco, and Firearms form 4473, on which she indicated she was purchasing the arms for herself. After the transaction was completed, Blake and Miss Montgomery carried the firearms to the rental car. Harris, Blake, and Miss Montgomery then left the area with Harris driving.
 
 
 6
 As they drove toward Miss Montgomery's home, Harris and Blake discussed the price that the guns could be sold for in New York. When Harris realized that he could make a tremendous profit by purchasing guns in Virginia and selling them in New York he demanded that they return to the gun store. Although Miss Montgomery was reluctant, Harris convinced her to cooperate by promising to give her one of the guns he purchased.
 
 
 7
 On the second visit, Harris selected two firearms and provided Miss Montgomery with $323.00 to purchase them. Miss Montgomery again filled out the required federal gun purchase form, again indicating she was purchasing the firearms for herself. After the transaction was completed, Harris carried the guns to the car and they all returned to Miss Montgomery's home.
 
 
 8
 Later that day, Blake and Harris drove to New York. Harris drove in Miss Sawyer's personal vehicle and Blake and Miss Graves used the rental car. At least some of the guns that had been purchased earlier that day were in the rental car during the trip to New York. Miss Graves was still under the impression that the sole purpose of the trip was to obtain narcotics. She did not learn of the firearms until they were en route to New York.
 
 
 9
 After arriving in New York the guns were displayed on a bed at Blake's residence. Buyers were brought in. After selling some of the guns, Harris purchased a quantity of crack cocaine, some of which he gave to Miss Graves for her services. Harris and Blake then returned to Virginia, again in separate cars. They were both arrested a short while later by agents of the Bureau of Alcohol, Tobacco, and Firearms.
 
 
 10
 Harris and Blake were charged on a six-count indictment. Count one charged them with conspiracy to knowingly cause false statements to be made with respect to material kept in the records of a federally licensed firearms dealer in violation of 18 U.S.C. § 924(a)(1)(A). Count two charged Harris with the substantive offense of knowingly causing false statements to be made with respect to material kept in the records of a federally licensed firearms dealer in violation of 18 U.S.C. § 924(a)(1)(A). Count three charged Blake with the same. Count four charged Harris with another § 924(a)(1)(A) violation. Count five charged Blake with the same again. Finally, count six charged Harris with receiving a firearm transported in interstate commerce after having been convicted of a felony in violation of 18 U.S.C. § 922(g)(1) and (2). After a trial, a jury found Harris guilty of all counts.
 
 
 11
 Harris' first assignment of error is that the district court allowed the government to present evidence of his prior drug use and drug dealing into his otherwise wholly firearms-related trial. His argument, grounded in Federal Rules of Evidence 403 and 404(b),[1] is that the testimony of certain government witnesses describing Harris' drug activities was unduly prejudicial at his trial, given the hostility that people generally have toward drug dealers. The government, on the other hand, argues that the acts described at trial were part of the overt acts of the conspiracy charged in the indictment and should be considered direct evidence. In the alternative, the government argues that although Harris was charged chiefly with gun offenses, the evidence of drugs was so inextricably linked to those charges that it had to be admitted for the jury to have the proper context of the crime.
 
 
 12
 The acts at issue were listed in count one of Harris' indictment. Count one charges Harris with conspiracy to knowingly cause false statements to be made with respect to material required to be kept by federally licensed firearms dealers. The overt acts alleged in count one include references to certain drug dealings. Specifically, that Harris recruited an individual by offering her money and narcotics in exchange for driving a car to New York and that Harris purchased a quantity of cocaine in New York and distributed part of that quantity to an unindicted co-conspirator. Accordingly, the government offered evidence that Barbara Graves aided Harris in renting a car for his New York trip in return for a quantity of crack cocaine and that Harris purchased drugs in New York and distributed a part of them to an unindicted co-conspirator. The government also offered evidence of Harris' general drug dealings with co-conspirators.
 
 
 13
 Rule 404(b) is not applicable to these acts. The evidence of Harris' drug transactions went to the crime charged against Harris in his indictment and thus was direct evidence of the conspiracy, not other crimes evidence potentially excludable under Rule 404(b). The government had the burden of proving these overt acts as an essential element of the conspiracy. Therefore, we are of opinion that the facts alleged in the indictment, that Harris promised drugs to induce aid in the conspiracy and that Harris was involved with drug dealings in New York, were properly admitted at trial. See United States v. Angelilli, 660 F.2d 23, 39 (2d Cir. 1981), cert. denied sub nom., Ribotsky v. United States, 455 U.S. 910 (1982); McCormick on Evidence § 190, at 801 n.17 (4th ed. 1992).
 
 
 14
 Harris next argues that the district court abused its discretion when it refused to grant the motion to sever his firearm possession charge from his other gun-related charges.[2] Harris asserts that he should have had a separate trial on the possession charge alone because revealing to the jury the fact he had been a convicted felon, to prove an essential element of the § 922(g) offense, prevented him from having a fair trial.[3] Harris now seeks a per se rule that would automatically sever the felony-gun possession charges from the other charges in his multicount indictment and give him, as well as all like-indicted defendants, a separate bifurcated trial on that charge.
 
 
 15
 We previously addressed this problem in United States v. Silva, 745 F.2d 840, 843-844 (4th Cir. 1984), cert. denied, 470 U.S. 1031 (1985). There, we refused to adopt a per se rule that a charge under 18 U.S.C. 922(g) should always be severed from other counts in an indictment. Silva, 745 F.2d at 844. We did so because we felt the proper balance between fairness to the defendant and judicial economy did not usually require a bifurcated trial when these counts are charged together. Silva, 745 F.2d 844. We held instead that with a proper limiting instruction and sound case management, the district court could avoid the possibility of undue prejudice when the prior felony conviction is presented to the jury. Silva, 745 F.2d 844.
 
 
 16
 Silva was essentially followed at Harris' trial. The district court sufficiently controlled the admittance of Harris' prior felony conviction so that the defendant was not unduly prejudiced. The prior conviction, a New York state conviction for possession of a controlled substance, was innocuously admitted at the close of the government's proof by stipulation. The district court also instructed the jury without objection that the conviction of other crimes was not evidence of commission of the crime charged, but only of intent or state of mind and the like. Reviewing the record as a whole, we are of opinion that there was no undue prejudice to Harris by the admission of the prior conviction at trial and, accordingly, no reason to disturb the district court's sound discretion in its refusal to sever this count.
 
 
 17
 Next, Harris claims that the district court should have instructed the jury on a definition of reasonable doubt. Harris argues that because the jury did not get this definition, he should be given a new trial. This argument is meritless. We have repeatedly admonished district courts not to give a definition of reasonable doubt to the jury, so we will not reverse a court when it does not. See, e.g., United States v. Headspeth, 852 F.2d 753, 755 (4th Cir. 1988).
 
 
 18
 Harris next argues that the district court's jury instruction of conspiracy was unduly repetitive, tending to reinforce the nature of the offense in the minds of the jury. Harris also argues that the district court erred when it refused to instruct the jury as to his requested jury instruction on "mere association" in a conspiracy. These arguments are also without merit.
 
 
 19
 We first note that the form of the instructions given to the jury is in the sound discretion of the district court, with no requirement that the district court adopt the exact language of requested instructions. United States v. Newson, 531 F.2d 979 (10th Cir. 1976). After reviewing the district court's instruction, we are of opinion that it was a clear and thorough statement of an otherwise complicated area of the law. See United States v. Webster, 639 F.2d 174, 181-82 (4th Cir.), cert. denied sub nom., Christian v. United States, 454 U.S. 857 (1981). We are of opinion the district court made no error in its instructions to the jury.
 
 
 20
 Finally, Harris argues that the evidence was insufficient to convict him and that the district court should have granted either his motion for judgment of acquittal or for a new trial. While the facts we have related are only a part of the evidence tending to show guilt, from them and upon a review of the record, we are of opinion that the evidence was ample to sustain the conviction.
 
 The judgment of conviction is accordingly
 
 21
 AFFIRMED.
 
 
 
 [1]
 Fed. R. Evid. 404(b) reads:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 [2]
 Federal Rule of Criminal Procedure 8(a) is construed in favor of joinder, allowing joinder of offenses if the offenses charged"are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."
 
 
 [3]
 Title 18 U.S.C. § 922(g) requires proof that the defendant was a convicted felon as an essential element of the crime