**Thomas Lee GOLDSTEIN, Plaintiff,**

v.

**CITY OF LONG BEACH,
et al., Defendants.**

**Case No. CV 04–9692 AHM (Ex).**

United States District Court,
C.D. California.

Feb. 27, 2009.

---

Barrett S. Litt, Litt Estuar Harrison and Kitson LLP, Los Angeles, CA, David S. McLane, Marilyn E. Bednarski, Ronald O. Kaye, Kaye McLane & Bednarski, Pasadena, CA, for Plaintiff.

Monte H. Machit, Robert E. Shannon, Long Beach City Attorney's Office, Maria M. Rohaidy, Taubman Simpson Young & Sulentor, Michael M. Peters, Law Offices of Michael M. Peters, Long Beach, CA, Timothy T. Coates, Greines Martin Stein and Richland LLP, Thomas J. Feeley, Thomas J. Feeley Law Offices, David J. Wilson, Steven J. Renick, Steven D. Blades, Manning & Marder Kass Ellrod Ramirez, Los Angeles, CA, Peter J. Ferguson, Ferguson Praet & Sherman, Santa Ana, CA, Catherine Mason Mathers, John J. Collins, Tomas A. Guterres, Collins Collins Muir and Stewart, South Pasadena, CA, Sarah L. Overton, Cummings McClorey Davis Acho and Associates PC, Riverside, CA, for Defendants.

ORDER GRANTING PLAINTIFF'S "MOTION TO COMPEL THE PRODUCTION OF TRANSCRIPTS AND SUPPORTING DOCUMENTS FROM THE 1989–1990 LOS ANGELES COUNTY GRAND JURY" AS MODIFIED BY PLAINTIFF'S SUPPLEMENTAL BRIEF

A. HOWARD MATZ, District Judge.

## I.

### INTRODUCTION

May this Court order the Los Angeles Superior Court to produce the transcripts of testimony given before and the exhibits presented to a Los Angeles County Grand Jury in 1989 and 1990, despite the Superior Court having ordered that such material "is not to be viewed, inspected or copied except by order of the Presiding Judge, Assistant Presiding Judge or the Supervising Judge of the Criminal Division"? That is the central issue raised by the motion of Plaintiff Thomas Goldstein to compel the production of the evidence presented to the 1989–1990 Grand Jury ("Grand Jury"), a motion that defendant County of Los Angeles vigorously opposes. In this ruling I conclude that the Court does have the right and authority to issue such an order and that under the narrowly-drawn, phased provisions I impose, the interests of justice and of judicial comity are both fully vindicated. Accordingly, the Court GRANTS Plaintiff's motion to compel, subject to the conditions set forth below.[1]

This is not the first difficult issue that this lawsuit has generated. A little over three months ago, the California Supreme Court held that California courts lack inherent power to release these grand jury materials to Goldstein. *Goldstein v. Superior Court,* 45 Cal.4th 218, 85 Cal.Rptr.3d 213, 195 P.3d 588 (Cal.2008). One month ago, the United States Supreme Court held that two of the named defendants, former Los Angeles County District Attorney John Van de Kamp and his then-Chief Deputy, Curt Livesay, are entitled to absolute prosecutorial immunity from Goldstein's claims that they violated his civil rights by failing to establish an information system containing impeachment material about informants and by failing adequately to train and to supervise trial prosecutors. *Van de Kamp v. Goldstein,* —— U.S. ——, 129 S.Ct. 855, 858, 172 L.Ed.2d 706 (2009). Although both those decisions described the compelling facts

---

1. Docket No. 198.

that led to this lawsuit, it is important to set them forth again. The pithiest way to do so is to incorporate the following description from the California Supreme Court's opinion.

In 1979 Goldstein was an engineering student and Marine Corps veteran with no criminal history. He became a murder suspect after an eyewitness to an unrelated shooting saw the gunman enter Goldstein's apartment building. No witness or forensic evidence connected Goldstein with the murder victim, but Long Beach police detectives showed Goldstein's photograph, among others, to Loran Campbell an eyewitness to the homicide. Campbell did not recognize anyone in the photo lineup, and Goldstein did not match Campbell's description of the suspect. However, a detective asked if Goldstein could have been the person Campbell saw running from the scene. Campbell said it was possible, though he was not certain. Goldstein was arrested and placed in a jail cell with Edward Floyd Fink, a heroin addict and convicted felon. At Goldstein's trial, Fink testified that Goldstein said he was in jail because he shot a man in a dispute over money. Fink claimed he received no benefit as a result of his testimony. Goldstein was convicted of murder in 1980. In 1988, the Los Angeles County Grand Jury began an investigation into the use of jailhouse informants, In 1990, it issued a public report concluding that misuse of jailhouse informants had been pervasive over the preceding 10 years. The grand jury found that the Los Angeles County District Attorney's office had demonstrated a "deliberate and informed declination to take the action necessary to curtail the misuse of jailhouse informant testimony." Among other deficiencies, it had failed to create a centralized index of potential impeachment information about informants, including any benefit they received for their testimony and their history of cooperation with law enforcement.[2]

The Superior Court of Los Angeles County ordered that "material accumulated and used by the 1988–89 Grand Jury and the 1989–90 Grand Jury in their investigations of the jailhouse informants is to be kept secure by the court. [¶] The material is not to be viewed, inspected or copied except by order of the Presiding Judge, Assistant Presiding Judge, or the Supervising Judge of the Criminal Division."

After the grand jury released its report [in 1998] Goldstein sought a writ of habeas corpus in federal court. At an evidentiary hearing in August 2002, Loran Campbell recanted his identification of Goldstein. Campbell admitted he had been overanxious to help the police. He had identified Goldstein based on what the police told him and his desire to be a good citizen, not on his observations on the night of the murder. Goldstein also presented evidence that Fink had received benefits for cooperating with law enforcement. The magistrate[3] found

---

**2.** This Court notes that the Grand Jury inquiry "span[ned] from approximately January, 1979 to the present [June 26, 1990]. That roughly parallels the period of review by the District Attorney's Jailhouse Informant Litigation Team, which ... identified 153 cases wherein jailhouse informants were called to testify during the ten years prior to October, 1988." Grand Jury Report at 4. Thus, the Grand Jury investigated the District Attor-

ney's jailhouse informant practices and procedures for a period preceding Goldstein's arrest and continuing long after his conviction. (The copy of the Grand Jury Report that Goldstein filed lacks consistent and clear pagination. The Court's citations are to the original pagination of the report located at the bottom center of each page.)

**3.** Magistrate Judge Robert Block.

Campbell credible, and stated: "It is readily apparent to this Court that Fink fits the profile of the dishonest jailhouse informant that the Grand Jury Report found to be highly active in Los Angeles County at the time of [Goldstein's] conviction." Goldstein's petition was granted. He was released from custody in April of 2003, after serving 24 years in prison.

In November 2004, Goldstein filed [this] suit in federal court against the City of Long Beach, four Long Beach police detectives, the County of Los Angeles, and two members of the Los Angeles County District Attorney's Office. He stated causes of action under the federal civil rights statute, 42 United States Code section 1983, including claims that the defendants wrongfully obtained his conviction based on their pattern and practice of misusing the testimony of jailhouse informants.

Goldstein first sought access to the grand jury material held by the court in a February 2006 letter to the Presiding Judge of the Los Angeles County Superior Court and the supervising judge of the court's criminal division. Counsel for the superior court replied that the material would not be disclosed because no statutory exception to the rule of grand jury confidentiality appeared to apply. When Goldstein's counsel said he was willing to abide by a protective order limiting use of the material to the civil rights case, court counsel evidently indicated that a subpoena would be needed to release the grand jury material.

In July 2006, Goldstein served a federal court subpoena on the superior court requesting production of the grand jury materials. Court counsel objected, asking Goldstein to withdraw the subpoena and seek access under the 1990 order of the superior court by "appropriate motion before the Presiding Judge,

the Assisting Presiding Judge, or the Supervising Judge of the Criminal Division of the Superior Court." Goldstein complied with this request. In September 2006 he filed a motion seeking access to the grand jury materials under sections 924.2, 929, and 939.1.

*Goldstein*, 45 Cal.4th at 222–23, 85 Cal. Rptr.3d 213, 195 P.3d 588.

The California Supreme Court issued its ruling on November 17, 2008, overturning the Court of Appeal's decision that "courts have inherent power to order disclosure of grand jury materials to a private litigant, in the interests of justice." *Id.* at 221, 85 Cal.Rptr.3d 213, 195 P.3d 588. This Court then scheduled a hearing for January 5, 2009. Thereafter the Court issued interim rulings but was forced to delay the filing of this order because of other caseload responsibilities.

To place the issues now before this Court in proper context, it is necessary to review the California Supreme Court decision.

## II.

## THE CALIFORNIA SUPREME COURT DECISION

■ In reversing the decision of the Court of Appeal, the California Supreme Court applied California law and held that "California courts do not have a broad inherent power to order disclosure of grand jury materials to private litigants." *Goldstein v. Superior Court,* 45 Cal.4th 218, 221, 85 Cal.Rptr.3d 213, 195 P.3d 588 (2008). As explained more fully below, this Court is required to apply and does apply federal law in ruling on Goldstein's present request. But it is important to note that nothing in this Court's opinion is inconsistent with, much less contradicts, the California Supreme Court, for the following reasons.

1. This Court has already fully displayed the comity that the Court unques-

tionably owes the state courts. As the California Supreme Court noted, in July 2006 counsel for the Superior Court requested Goldstein to withdraw his federal subpoena and proceed by motion practice in Superior Court, which Goldstein did. Two years later, when Goldstein filed this motion to compel, this Court refrained from ruling on the motion until after the California Supreme Court issued a ruling, In addition, the Superior Court has been granted the right to participate in proceedings on this motion as a real party in interest.[4] Not only did this Court thereby accede to the California courts' right to consider Goldstein's arguments, this Court now has gained the benefit of those courts' guidance. And that guidance has led the Court to craft a ruling that reflects utmost deference to California precedent. The ruling requires a staged and limited disclosure pursuant to an exacting protective order. Moreover, it sets in motion a process that the California Supreme Court implicitly authorized, as explained below in Paragraph 5. Finally, this ruling establishes a procedure for Goldstein to request access to actual transcripts and exhibits that the Superior Court itself adopted in response to a similar request for access to the same information ten years ago.

2. The Supreme Court's ruling was based on a straightforward proposition: "The [California] Legislature has authorized limited disclosure of grand jury materials to private parties, and the Court of Appeal's holding [that courts have inherent power to allow Goldstein to obtain these materials] creates a broad exception that would swallow the statutory rules ..." *Goldstein*, 45 Cal.4th at 221–22, 85 Cal. Rptr.3d 213, 195 P.3d 588. Here, Goldstein is not relying on California law or on California courts' inherent powers, and this Court need not even address those questions.

3. The California Supreme Court recognized that in this federal action Goldstein could "renew his attempt to obtain discovery by federal subpoena" and it declined to demarcate "the extent of federal court authority to compel disclosure over the objection of a state court." *Id.* at 225 n. 6, 85 Cal.Rptr.3d 213, 195 P.3d 588. At the very least, this statement implies that the California Supreme Court acknowledged that this federal court has the right and the duty to apply federal law in adjudicating Goldstein's request.

4. Even in applying California law, the California Supreme Court did not outright bar disclosure of the grand jury materials.

**4.** The Superior Court is not a party to this case and its counsel is different than counsel for Defendant County of Los Angeles. In the proceedings in state court and in earlier proceedings in this Court, the Office of County Counsel appeared on behalf of the grand jury system in Los Angeles County. After this motion to compel was filed in July 2008, a private law firm was retained to represent the Superior Court as a real party in interest, and it filed an opposition to this motion in July 2008. No counsel has appeared to represent the grand jury as such or to assert any position on its behalf. After the California Supreme Court issued its ruling in November 2008, this Court invited the Superior Court, as well as the parties, to file supplemental briefs. The Superior Court did not file a

supplemental brief. At the hearing held in open court on January 5, 2009, the Court had the following colloquy with counsel for the Superior Court: THE COURT: "Do you wish to assert orally any particular position as to the outcome of this pending motion in light of the California Supreme Court's decision?" COUNSEL: "No, Your Honor. We're here to abide by whatever the Court's decision is. The Superior Court has not taken a position." (Tr. at 5–6.) Thereafter, to be sure, counsel filed papers contending that she "did not intend to imply that the prior opposition filed by the Superior Court in July 2008 was withdrawn." But despite being given a clear opportunity to provide substantive opposition to disclosure *after* the California Supreme Court ruling, the Superior Court did not do so.

Rather, it indicated that Goldstein may be entitled to disclosure of transcripts under California Penal Code § 924.2 for the purpose of impeachment. In addition, it left open the possibility that there might also be "a potential nonstatutory avenue of disclosure ..." *Id.* at 224 n. 14, 85 Cal. Rptr.3d 213, 195 P.3d 588. Citing its own *dicta* in *Shepherd v. Superior Court*, 17 Cal.3d 107, 130 Cal.Rptr. 257, 550 P.2d 161 (1976), *rev'd on other grounds, People v. Holloway*, 33 Cal.4th 96, 14 Cal.Rptr.3d 212, 91 P.3d 164 (2004) and in *Ex Parte Sontag*, 64 Cal. 525, 2 P. 402 (1884), the California Supreme Court "observed that 'there may be cases of urgent and particularized need in which those policies [supporting grand jury secrecy] must be made to yield to some extent in order to accommodate the demands of truth and fairness in civil litigation' ... However, such a limited exception might be deemed consistent with the *Sontag* court's *dictum* contemplating disclosure when 'absolutely necessary,'" *Id.* Justice Kennard embraced this path toward disclosure in her concurrence: "... [T]he Legislature cannot preclude such *disclosure* when preclusion would deny the requesting party the right to due process guaranteed under the state and federal constitutions." *Id.* at 235, 85 Cal.Rptr.3d 213, 195 P.3d 588. Justice Moreno, too, acknowledged the " 'absolute necessity' exception to the rule against discovery of grand jury material.' " *Id.* at 236, 85 Cal.Rptr.3d 213, 195 P.3d 588 (concurring).

5. At the conclusion of its opinion, the California Supreme Court implied that the Superior Court should release to this Court for *in camera* review the Grand Jury transcripts of witnesses who testify at Goldstein's civil trial. It wrote:

> Section 924.2 permits disclosure only for purposes of impeachment. It does not authorize a litigant to obtain unlimited disclosure in advance of a witness's testimony. To preserve the narrow scope of the statute, the appropriate procedure is for the witness to testify first. Counsel may then request the court to examine the transcript of that witness's grand jury testimony in camera, to determine if it provides potentially relevant impeachment material. If it does, the court may release the relevant pages to counsel, with a protective order restricting the use of the material to impeachment.
>
> We leave it for the superior court and the federal district court, with the cooperation of the parties, to sort out additional appropriate procedures for providing Goldstein with access to the testimony or grand jury witnesses under section 924.2, should he seek that limited form of disclosure.

*Goldstein*, 45 Cal.4th at 234, 85 Cal. Rptr.3d 213, 195 P.3d 588. The procedure that the California Supreme Court deemed "appropriate" presupposes that at the time of trial this Court would already have in its possession the transcript of Grand Jury testimony given long ago by the trial witness. In that respect, the California Supreme Court evidently assumed that by the time of trial in this case the Superior Court would have cooperated with this Court by providing the transcripts for *in camera* review.

## III.

## ANALYSIS

**A. This Court Has The Authority to Order Disclosure of Materials Privileged Under State Law, including Grand Jury Material.**

*1. In federal question cases such as this section 1983 action, federal law governs the existence and scope of evidentiary privileges.*

Federal Rule of Evidence 501 provides that evidentiary privileges asserted in federal court are governed by the common

law as interpreted by federal courts, except that when state law supplies the rule of decision, state law determines the privilege. In *Kerr v. United States District Court*, 511 F.2d 192 (9th Cir.1975), *aff'd*, 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976), a prisoners' civil rights action, the Ninth Circuit rejected California Adult Authority members' claim of privilege for personnel files based upon the California Evidence Code and California Government Code. The court explained; "In federal question cases the clear weight of authority and logic supports reference to federal law on the issue of the existence and scope of an asserted privilege." *Id.* at 197 (quoting *Heathman v. United States District Court*, 503 F.2d 1032, 1034 (9th Cir.1974)). *See also NLRB v. N. Bay Plumbing*, 102 F.3d 1005, 1009 (9th Cir.1996) (stating that federal law governs claim of privilege in National Labor Relations Act case). The California Supreme Court recognized the same principle in its opinion, when it stated that "Goldstein is ... free to renew his attempt to obtain discovery by federal subpoena." *Goldstein*, 45 Cal.4th at 225 n. 6, 85 Cal.Rptr.3d 213, 195 P.3d 588.

■ Although federal law governs, "a strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy" *United States v. King*, 73 F.R.D. 103, 105 (E.D.N.Y.1976) (Weinstein, J.). As the California Supreme Court noted in its opinion, however, California courts lack the "general authority to go further [than the statutory restrictions on the release of grand jury materials], to fashion broadly applicable standards like those articulated in *Douglas Oil [Co. v. Petrol Stops Northwest*, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979) ]." *Goldstein*, 45 Cal.4th at 230, 85 Cal.Rptr.3d 213, 195

P.3d 588. This Court is not bound by those California statutory restrictions; it *is* bound to apply federal standards, such as those in *Douglas Oil. See* subsection B.2, *infra.*

### 2. The weight of appellate authority entitles federal courts to require state courts to disclose state-privileged grand jury materials.

The Ninth Circuit has not had occasion to consider requests for disclosure of state grand jury material that is privileged or was sealed under state law. Several other Courts of Appeal have considered such requests.

The first and most widely cited reported decision dealing with this issue is *Socialist Workers Party v. Grubisic*, 619 F.2d 641 (7th Cir.1980), a civil rights action. There, a county prosecutor appealed from a district court order requiring him to produce to the plaintiffs grand jury transcripts that had been released during a previous state criminal trial, including transcripts of the grand jury testimony of three defendants in the civil rights action. *Id.* at 642. The Seventh Circuit noted that "because plaintiffs' claims arise under federal law, the privileged nature of these materials under Illinois law is not controlling," but it held that comity required "the federal courts defer action on any disclosure requests until the party seeking disclosure shows that the state supervisory court has considered his request and has ruled on the continuing need for secrecy." *Id.* at 643–44. This requirement, however, "does not give the state courts a veto over disclosure in this federal civil rights case. This preliminary stage is designed merely to forestall unnecessary intrusion by the federal courts in state grand jury proceedings or, at least, to ensure that the important state interest in secrecy is thoroughly considered." *Id.* at 644.[5]

---

5. In the state court proceedings that led to the California Supreme Court's ruling, the Office

Although the outcome of *Grubisic* after remand has not been reported, the Seventh Circuit did have occasion to review a federal court order requiring such disclosure in *Lucas v. Turner,* 725 F.2d 1095 (7th Cir.1984). There, a federal district judge in a section 1983 action had directed plaintiffs to petition the chief judge of the county circuit court to order release of the grand jury testimony of the defendants in the federal case. *Id.* at 1097. The chief judge thereupon ruled that plaintiffs had not shown the materiality of their very broad request. *Id.* The Seventh Circuit acknowledged the state court decision and stated: "Since the *Grubisic* procedures were followed, the district court could then proceed to a determination of the extent the materials deserved protection under federal law." *Id.* at 1099. Although the district court had granted plaintiff's request for disclosure of grand jury merits under the applicable federal standards, the Seventh Circuit's lengthy assessment of the relevant factors in *Douglas Oil* prompted it to disagree and reverse, *Id.* at 1108–09.

The Fourth and Tenth Circuits have endorsed the Seventh Circuit's analysis and approach. In *United States v. Silva,* 745 F.2d 840, 845 (4th Cir.1984) the Fourth Circuit stated that Federal Rule of Criminal Procedure 6(e) "clearly" is "the governing standard" regarding the production of state grand jury testimony in federal court. In *Silva,* a federal criminal defendant sought disclosure of the grand jury testimony in a previous state court proceeding of a prosecution witness, for impeachment purposes. *Id.* at 844. An Assistant State Attorney testified that the grand jury testimony was "of a highly sensitive nature" and "related to on-going

proceedings in the state of Florida." *Id.* at 844–45 (internal quotations omitted). After examining the grand jury minutes *in camera,* the district court found the witness's testimony to be substantially consistent in all material respects and refused to order disclosure of the transcript. *Id.* at 845. The Fourth Circuit affirmed, relying on the district judge's assessment of the purported inconsistencies in the witness's testimony and the Assistant State Attorney's testimony that there were ongoing grand jury proceedings in the Florida court. *See id.* at 845–46.

In *United States ex rel. Woodard v. Tynan,* 757 F.2d 1085 (10th Cir.1985), a False Claims Act plaintiff had unsuccessfully petitioned the Colorado state courts for disclosure of business records that the defendants had produced to a state grand jury. The plaintiff filed a motion in federal court to compel defendants to disclose the records. *Id.* at 1086. The district court denied the motion because the defendants no longer had custody of the records, the state court having ordered them sealed along with other grand jury materials. The Tenth Circuit reversed on the basis that the district court erroneously assumed it had no authority to compel the state court to release the records. *Id.* at 1090. Although "[i]t must be now regarded as conclusively decided by the law of the case that Colorado law requires these documents to be kept secret[,]" the court wrote, "that does not resolve the issue." *Id.* at 1089. "The [plaintiff's] claim arises under federal law, and so the privileged nature of these materials under state law is not controlling." *Id.* (citing *Grubisic,* 619 F.2d at 643). Accordingly, the Tenth Circuit held, the district court should have applied federal law concerning grand jury

of the County Counsel, representing the grand jury, contended that *Socialist Workers Party v. Grubisic* was controlling authority and proposed that a special master be appointed to

review the grant jury materials and recommend which records might be disclosed. *Goldstein,* 45 Cal.4th at 224, 85 Cal.Rptr.3d 213, 195 P.3d 588.

disclosure and ordered the release of the materials for *in camera* inspection. *Id.*[6]

In the most recent appellate case on point, *Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d 345, 359 (3d Cir.2003), the Third Circuit also acknowledged that federal law governed. Yet in a footnote it expressed doubt that *Douglas Oil* and Federal Rule of Criminal Procedure 6(e) provided the sole governing standard, noting that a federal court must give due deference to the state's strong interest in secrecy and must consider as well the Full Faith and Credit Clause. *Id.* at 359 n. 10. But the Third Circuit did not have to decide whether the district court could order the disclosure of state grand jury materials, because the plaintiff had not yet presented his request to the state court. *Id.* at 358–59. Following *Grubisic*, the court ordered the plaintiff to do so.

■ What is the significance of these appellate decisions? First, they all require the party seeking state grand jury material to petition the state court before seeking a federal ruling. Second, they all affirm that regardless of the state court's decision, federal courts have a duty to assess the disclosure request under federal law. Indeed, three of the four circuits that posed the question—the Fourth, Seventh, and Tenth—endorsed the view that regardless of the result in state court federal courts may *require* state courts to disclose grand jury material. This Court's ruling is consistent with both these principles.[7]

**B. Under Applicable Federal Authority, Goldstein Has Met The Requirements for At Least Initial Disclosures.**

*1. Goldstein's current request for disclosure, as modified from his original subpoena.*

■ In July 2006 Goldstein served a federal subpoena on counsel for the Superior Court. Directed to the Custodian of Records of the Superior Court, the subpoena broadly sought all materials accumulated by the Grand Jury, including a

6. Upon rehearing, the Tenth Circuit changed the disposition of the appeal, without disavowing the prior panel opinion. *United States ex rel. Woodard v. Tynan*, 757 F.2d 1085 (7th Cir.1985) (rehearing *en banc*). Under Colorado law, it appeared, defendants were entitled to request the state court to return their business records after the grand jury has completed its investigation. *Id.* at 1089. Because the district court could order defendants to make that request under state law, the Tenth Circuit decided it was not necessary for it to order the state court to release the records.

7. There are also a few district court decisions illustrating these principles. In *Shell v. Wall*, 760 F.Supp. 545, 546–48 (W.D.N.C.1991), the district court denied a motion for disclosure of state grand jury transcripts after a lower state court had denied the same motion, and it did so relying on federal law, The court wrote: "The test to be utilized by the district court is flexible-one that weighs the public interest served by disclosure against the particularized need for continued secrecy. The

test is adaptable to different circumstances and sensitive to the fact that the requirements of secrecy are greater in some situations than in others." *Id.* at 547–48 (citations omitted). In *Stump v. Gates*, 777 F.Supp. 796, 798–99, 803 (D.Colo.1991), a section 1983 action, the court also applied federal law, but it did order disclosure, emphasizing that the state court judge who had denied the motion indicated that the federal judge should make the determination and had voluntarily released the requested grand jury material to the federal judge for the latter's *in camera* review. In contrast, in *Resolution Trust Corp. v. Castellett*, 156 F.R.D. 89, 95–96 (D.N.J.1994), a magistrate judge refused to order disclosure of sealed state grand jury records after the state court denied a motion to unseal the records, in deference to state law. Distinguishing *Grubisic* and its progeny, the court reasoned that the basis for the state court decision was not a state grand jury secrecy privilege, but a state statute requiring the sealing of records in criminal matters terminated in favor of an accused individual, *Id.* at 95.

transcript of all proceedings, all exhibits, transcript summaries, witness lists, and exhibit lists. Goldstein renewed this request in the motion to compel production that he filed in July 2008. In his supplemental brief filed in this Court after the California Supreme Court decision, Goldstein narrowed his initial request. He now proposes to have this Court order the Superior Court to turn over to his attorneys only the witness index, exhibit index, and transcript summaries—not the actual transcripts—so that they may identify the specific portions of the substantial grand jury record he needs. (The Grand Jury heard testimony from 120 witnesses and received 147 exhibits into evidence.) After this initial review, which would be subject to a protective order, if Goldstein's attorneys determine with particularity what they need, they will ask the Court to order the Superior Court to provide to this Court *in camera* those specific documents and transcripts which the attorneys identity. Then the Court would review them and determine whether disclosure of those materials would be warranted and for what purposes.

There has been no state court ruling on the limited disclosure Goldstein now requests, but there have been lengthy state court proceedings that resulted in a denial of Goldstein's initial broad request. The state court proceedings having ended, this Court is now in a position to weigh the state's strong interest in grand jury secrecy, as expressed in the California Supreme Court's opinion, along with all the other factors that it must consider under federal law and common law, in deciding whether to order the custodian of the Grand Jury records to release these materials.

### 2. The Douglas Oil *standards for disclosure requests.*

■ As previously noted, *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979) provides the standards governing requests for disclosure of grand jury materials in federal court, including state grand jury materials. *See Grubisic,* 619 F.2d at 644; *Woodard I,* 757 F.2d at 1090; *Silva,* 745 F.2d at 845, To start with, *Douglas Oil* reaffirmed the reasons for grand jury secrecy:

(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witness who may testify before [the] grand jury and later appear at the trial of those indicted, by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Douglas Oil,* 441 U.S. at 219 n. 10, 99 S.Ct. 1667 (citations and quotation marks omitted).[8] Furthermore, the Supreme Court

---

**8.** Although the California Supreme Court distinguished California's narrow statutory scheme for disclosure of grand jury materials from the broad *Douglas Oil* test, it too recognized that the common law roots of both the state and federal standards are the same. It noted that "the Legislature intended to incorporate the common law tradition of preserving the secrecy of grand jury proceedings"

and it cited Douglas Oil's five-prong description of the reasons for that policy. *Goldstein,* 45 Cal.4th at 226, 85 Cal.Rptr.3d 213, 195 P.3d 588 (citing *Douglas Oil,* 441 U.S. at 219, 99 S.Ct. 1667); *see also id.* at 237–40, 85 Cal.Rptr.3d 213, 195 P.3d 588 (Moreno, J., concurring) (describing the common law roots of both the state and federal standards).

cautioned, "the courts must consider not only the immediate effects [of disclosure] upon a particular grand jury, but also the possible effect upon the functioning of future grand juries. Persons called upon to testify will consider the likelihood that their testimony may one day be disclosed to outside parties. Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties." *Id.* at 222, 99 S.Ct. 1667.

■■■ The Supreme Court then attempted to balance the competing interests and concerns raised by a motion to disclosure grand jury materials. It stated that:

> Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice to another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.

441 U.S. at 222, 99 S.Ct. 1667. The burden is on the party seeking disclosure to demonstrate such need " 'with particularity,' " *id.* at 221, 99 S.Ct. 1667 (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)), and that the need outweighs the public interest in grand jury secrecy. *Id.* at 222, 99 S.Ct. 1667. A generalized desire for discovery needed to prove one's case does not constitute the requisite showing of particularized need. *See, e.g., Baker v. U.S. Steel Corp.*, 492 F.2d 1074, 1076 (2d Cir.1974), Rather, "the typical showing of particularized need arises when a litigant seeks to use 'the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like.' " *Douglas Oil Co.*, 441 U.S. at 222 n. 12, 99 S.Ct. 1667 (quoting *Procter & Gamble Co.*, 356 U.S. at 683, 78

S.Ct. 983). The party seeking disclosure must offer more than mere speculation to overcome the policy of grand jury secrecy. *See United States v. Walczak*, 783 F.2d 852, 857 (9th Cir.1986) (denying a motion for grand jury transcripts because defendant did not allege specific facts supporting his motion, making his motion speculative). As the considerations requiring grand jury secrecy become less relevant in a particular case, the party asserting the need for the materials will have a lighter burden to carry. *Douglas Oil Co.*, 441 U.S. at 223, 99 S.Ct. 1667. Yet disclosure must be amply justified even when the grand jury has ceased to function because, although reduced, the interests in grand jury secrecy continue long after the investigation has terminated. *Id.* at 222, 99 S.Ct. 1667.

Here, in opposing disclosure, the County relies only on the fourth reason for secrecy that the Supreme Court identified in *Douglas Oil:* to encourage free disclosures to future grand juries. The other four reasons are not pertinent to this case,

### 3. Goldstein's current showing of need for the proposed initial disclosure.

This case has two unique features absent in the above-cited federal cases. First, almost nineteen years have passed since the close of the Grand Jury investigation, which probed events going back to January 1979. This thirty-year interval is much longer than in the typical case, where a civil action follows relatively soon after, or even during the pendency of, a criminal grand jury investigation. Second, given the nature and purpose of the Grand Jury investigation, neither the parties nor the Court actually know who testified before the Grand Jury and which documents that body received into evidence. Nonetheless, in seeking access to the witness list, exhibit list, and transcript summaries, Goldstein has shown that he knows what

he is looking for, that he is likely to find it, and that what he is likely to find is evidence that is essential for his civil case.

### a. Goldstein's Monell claims

 In the third and fourth claims for relief in his Second Amended Complaint, Goldstein alleges that the District Attorney of the County of Los Angeles and the Long Beach Police Department engaged in a pattern and practice of using perjurious jailhouse informants and failing to disclose to criminal defendants critical information concerning informants. Goldstein's *Monell* claims turn on evidence of the institutional practices of these agencies thirty years ago.

For those claims, Goldstein has established sufficient need for initial, limited access to the Grand Jury records. The District Attorney's Office was intimately involved in the Grand Jury investigation. Various high level personnel as well as Deputy District Attorneys testified or otherwise provided information. It is likely that defendants Van de Kamp (the District Attorney at the time of Goldsteins arrest and prosecution) and Livesay (the Chief Deputy) were among the witnesses. It is almost certain that prosecutors provided information to the Grand Jury that would be evidence of the extent of the District Attorney Office's knowledge of, and responses to, problems concerning jailhouse informants at the time Goldstein was investigated, indicted, and tried. This conclusion is derived from the fact that in its report the Grand Jury concluded that the District Attorney had notice that jailhouse informants lacked credibility as early as January 1979, some ten months before Goldstein was arrested in November 1979 and placed in the same Long Beach jail cell as the informant Fink. (He was tried and convicted in 1980.)

In the sections of the Grand Jury Report dealing with the District Attorney's Office and the California Attorney General's Office, the Grand Jury described how in 1979 and 1980 these two offices looked into at least one informant's allegations of perjurious misuse of informants. In a section entitled "District Attorney Staff Knowledge of Informant Abuses Before Public Disclosures," the Grand Jury wrote:

In the late 1970s, two prosecutorial agencies conducted inquiries into claims by a jail house informant that he knew of improper conduct by law enforcement and District Attorney personnel. Despite the investigative resources committed, the agencies could never verify the allegations. It was therefore concluded that the informant, who then was a state prisoner, had lied, possibly in an effort to attain more favorable conditions of custody. Nonetheless, *the record of the informant's activity and the conclusion of the investigation was never indexed or widely distributed within the agencies, and the informant surfaced repeatedly as a witness in criminal litigation.*

Grand Jury Report at 97 (emphasis added).

The Grand Jury report went on to describe the case in more detail. It noted that "[i]n May or June of 1980, an administrator in the District Attorney's Office" read two letters dated January 1979 from an informant to his office predecessor "advising how he and another informant participated [offered information] falsely in several cases." Grand Jury Report at 98. The administrator discovered that the Attorney General's Office was investigating the informant's allegations and, "[i]n June or July of 1980, the administrator received a letter from the Attorney General's Office finding the informant's claims not credible." *Id.* The Grand Jury reported that the administrator then instructed the deputy district attorney who had significant contact with this informant to terminate

the association and "advised a few others, but never disseminated information on this informant generally." *Id.* at 97–98.

The Grand Jury described this same case in the section of its report entitled "Attorney General Staff Knowledge of Informant Abuses." In that section it reiterated: "In January 1979, a state prisoner offered notice of alleged improprieties to the Los Angeles County District Attorney's Office." *Id.* at 125. The inmate stated that he had given false testimony in several criminal cases, including murder cases, and that "the authorities were aware of the false testimony and had, in some cases, supplied him with information [to be] used in the testimony. *Id.* at 125–126. The District Attorney's Office, which had previously received notice of these allegations from the informant and conducted its own investigation, referred the matter to the Attorney General Office for "follow-up investigation." *Id.* at 126. Ultimately, the Deputy Attorney General in charge of the matter formed "the opinion that … the inmate was [not] a person who could be used as a witness. 'I just felt he could whipsaw anybody if he wanted to.'" *Id.* at 127. Thereafter, he closed the investigation and informed "a ranking District Attorney administrator" in writing of his conclusions about this informant. *Id.* at 127–128.

In addition to the District Attorney's Office, the Long Beach Police Department

almost certainly was a subject of the Grand Jury investigation. The District Attorney provided to the Grand Jury a list of 158 "Cases Where Informant Has Been Used," arranged alphabetically by defendant's name. The list was "current as of 7–12–90," according to a handwritten notation. It identified the criminal cases—the oldest from 1977—in which informants had testified at a preliminary hearing or at trial, the prosecutor the courthouse where the trial was conducted, and, in some cases, the investigating officers and their agency and detail. Declaration of Ronald O. Kaye (Dec. 16, 2008) ("Kaye Reply Decl.") ¶ 2, Ex. L.[9] Of the seventy-nine cases where the District Attorney identified the investigator officer(s) and agency, nine were cases that the Long Beach Police Department's Homicide Detail investigated, a clearly disproportionate number. One such case was that of Goldstein himself. The list notes that informant "Eddy Fink" testified at trial and that Goldstein was found guilty by the jury in April 1980. In addition, it names as the investigating officers two of the defendants he has sued in this case; John Miller and William Collette. This evidence establishes that the Grand Jury in fact received considerable information about the Long Beach Police Department's extensive use of informants.[10] Therefore, it is highly-likely that Long Beach Police Department personnel testified before the Grand Jury or provid-

---

9. This document, Exhibit L, is presumably one of the exhibits within the Grand Jury record. Attorney Verna Wefald provided Goldstein with this document and Goldstein's counsel believes the County has produced it in discovery in this case. Declaration of Ronald O. Kaye (July 14, 2008) ("Kaye Decl.") ¶ 2.

10. The Grand Jury's inquiry into Long Beach cases probably was not limited to the cases on the list from the District Attorney's Office, because that list was not complete. Goldstein's attorneys have identified at least eigh-

teen cases handled by the Long Beach Homicide Detail where jailhouse informants were used in criminal trials from 1978 to 1988. Kaye Decl. ¶ 9. In at least three of those cases, including Goldstein's, habeas corpus was granted (at least in part) based on improprieties in the use of jailhouse informants. *Id.* Goldstein's list includes the nine cases on the District Attorney's list, a few other cases that the District Attorney had reported as having been tried in the Long Beach courthouse without identifying the investigating agency, and a few others that were not on the District Attorney's list at all.

ed information to the Grand Jury. *See* Grand Jury Report at p. 2–3 (noting that various police agencies in the County participated in the investigation).

No discovery on the pattern and practice allegations that Goldstein has pursued can come close to replicating the breadth and depth of the Grand Jury investigation. Once he is allowed to ascertain the names of witnesses who testified before the Grand Jury, he will likely present a compelling case for disclosure of specific transcripts in order to refresh the recollections of and test the truth and accuracy of witnesses testifying regarding the institutional practices and policies that existed thirty years ago.

*b. Goldstein's § 1983 claim against Long Beach Detectives John Miller, William Collette, and Logan Wren.*

█ Goldstein has also demonstrated that initial, limited access to the Grand Jury records would yield information relevant to his § 1983 claims against Defendants Miller, Collette, and Wren, who were homicide detectives in Long Beach. Goldstein alleges that because Fink "had a preexisting relationship with the Long Beach Police Department and had exchanged alleged 'confessions' . . . for benefits before," Fink contacted Detectives Wren and Collette to offer them information about the murder the day after he met Goldstein in jail. Second Am. Compl. ¶ 48. He alleges that the defendant police officers conspired to plant Fink in his jail cell and concocted a false confession in order to create probable cause to charge him with murder. *Id.* ¶¶ 50–53.

The abovementioned list of "Cases Where Informant Has Been Used" included multiple cases in which Detective Miller or Collette or Wren (and sometimes two of

them) were the investigating officers. *See* Kaye Reply Decl. ¶ 2, Ex. L. In total, Detective Miller was listed as the investigating officer in three cases, Detective Collette in four cases, and Detective Wren in four cases. Altogether, these detectives worked with ten different informants, according to this list. Their names appear more frequently than the names of officers from any other police agency in the county. Hence, it is logical to surmise that the Grand Jury materials contain information specific to these defendants' use of informants, including Fink, who is deceased.

There is more. Evidence linking Defendant Miller to another notorious informant Sidney Storch, suggests that Miller may have actually testified or provided information to the Grand Jury, Footnote 34 of the Grand Jury Report referred to unnamed individuals whom the Grand Jury was recommending that the District Attorney consider prosecuting for informant abuses. Jailhouse informant Sidney Storch was one of the names on the Grand Jury's list and he was subsequently indicted for committing perjury at the trial of one Sheldon Sanders. *See* Pl.'s December Brief at 16, Ex. R.; Declaration of Verna Wefald (July 14, 2008) ("Wefald Decl.") ¶¶ 11–12; Declaration of Verna Wefald (Dec. 16, 2008) ("Wefald Reply Decl.") ¶ 3, Pl.'s Ex. O.[11] At the trial, Storch testified that he was "well acquainted with" Detective Miller and so Miller was the first person he contacted about Sanders's supposed confession. Wefald Reply Decl. ¶¶ 3, 11, Ex. P. This link between Defendant Miller and an informant whom the Grand Jury recommended for prosecution for perjury further strengthens Goldstein's case for obtaining access to the indexes and summaries.

---

11. Detective John Miller's name was also on the same document as the list of persons recommended for prosecution, but in a differ-

ent section. At the hearing on January 5, 2009, the attorneys for both sides were unable to explain the significance of that.

### c. Initial, limited access is necessary.

 In its opinion, the California Supreme Court suggested that a witness would have to testify at the trial in this case before the Court could even obtain his grand jury testimony, much less examine it *in camera. Goldstein,* 45 Cal.4th at 233, 85 Cal.Rptr.3d 213, 195 P.3d 588. Although this Court agrees in principle that a litigant may not "obtain unlimited disclosure in advance of a witness's testimony," *id.,* the Court respectfully notes that it cannot adopt the California Supreme Court's suggested procedure. As noted above, the California Supreme Court evidently presupposed that at the time of trial, counsel and the Court would already know who testified before the Grand Jury and the Court would already have in its possession the witnesses' Grand Jury transcripts. If Defendant County of Los Angeles had its way on this motion, however, that would not be the case; the Court would have nothing by the time testimony was underway, It is obvious that as a matter of sound judicial management, it is critical that the Court and the attorneys review the transcripts *before* trial. The practical and well-established procedure in federal courts is for the parties to determine through motion practice before trial whether a particular transcript should be disclosed at all, which portions of the transcript may be used at trial, and for what precise purposes they may be used. *See United States v. Fischbach and Moore, Inc.,* 776 F.2d 839, 846 (9th Cir.1985) ("The district court should rely on the parties to determine which portions of the transcripts, if any, are necessary for impeaching testimony or refreshing recollection, or make specific findings as to why the entire transcripts should be disclosed.") Otherwise, the Court and the jury would be subjected to inordinate delays.

### 4. The diminished need for secrecy in this case.

The focus of the secrecy analysis in this case is the concern that any incursion into grand jury secrecy may hamper the ability of future grand juries to secure untrammeled disclosures from witnesses. If the veil of secrecy has already been lifted, however, this concern is diminished. In the case that led to the *Douglas Oil* opinion, for example, the transcripts that were sought had in fact been released previously, so further disclosure to the requesting party would create no additional risk of retaliation against the witnesses. *See Douglas Oil,* 441 U.S. at 223 n. 14, 99 S.Ct. 1667. Thus, the Ninth Circuit reasoned on remand, "the weight of the fourth factor—encouraging untrammeled disclosure—was sharply reduced." *Petrol Stops Northwest v. Continental Oil Co.,* 647 F.2d 1005, 1009 n. 2 (9th Cir.1981).

In this case, as in *Douglas Oil,* the documents Goldstein requests have been disclosed in the past, by permission of the Superior Court, to defense attorney Verna Wefald. The declaration Wefald filed in support of Goldstein's motion is worth recounting at length. In the late 1990s, in the wake of the Grand Jury's revelations about the jailhouse informant abuses, Wefald was representing Bobby Joe Maxwell in an evidentiary hearing on the issue of whether jailhouse informant Sidney Storch gave false testimony at Maxwell's trial. The Superior Court judge presiding over the hearing, Judge Rappe, authorized the parties to obtain records from the 1989–1990 Grand Jury, and the supervising judge of the Superior Court issued an order permitting the custodian of records to release records pertaining to Sidney Storch to Wefald. Subsequently, Wefald learned from the Federal Public Defender's Office [12] that there were numerous

---

12. The Federal Public Defender's Office had obtained certain transcripts from the 1989– 1990 Grand Jury record for use in one of its capital cases.

witnesses she had never heard of who had testified about Sidney Storch before the Grand Jury and about law enforcement involvement in or awareness of the jailhouse informant scandal. Wefald then contacted special counsel for the Grand Jury, Douglas Dalton, to figure out how the records were organized. Dalton told her that the grand jury records were carefully indexed and preserved so that attorneys would be able to consult the indexes and summaries and determine which records their clients needed. Wefald Decl. ¶ 5. *Even now, some nineteen years after Special Counsel Dalton completed his work, he has reiterated that important point in the declaration he filed in this case.* Declaration of Douglas Dalton (July 14, 2008) ("Dalton Decl.") ¶ 6. After Wefald informed the court of this fact, the then-Presiding Judge and Judge Rappe issued various orders resulting in the disclosure of these indexes and summaries, pursuant to a protective order. Wefald Decl. ¶ 6, Ex, 2. Wefald read the indexes and transcript summaries and petitioned for disclosure of certain transcripts. Eventually, Judge Rappe reviewed the transcripts *in camera* and provided them to the parties.

Since the Superior Court already disclosed the indexes and summaries in 1999, viewed fairly and realistically, an identical disclosure ten years later could have no chilling effect on future grand juries whatsoever. Indeed, the very existence of the indexes and summaries confirms what Mr. Dalton has declared: the Grand Jury record was meant to be accessible to future litigants who can demonstrate that they are entitled to it. Dalton Decl. ¶ 6.

In opposing Goldstein's current proposal, the County relies only on an abstract concern for grand jury secrecy, undoubtedly because the County cannot identify any consequences for specific individuals if their status as a grand jury witness were disclosed in the limited manner proposed. The names of informants and the law enforcement personnel who worked with them have been partially disclosed already in the District Attorney's list (Exhibit L), in the media, and in court proceedings.[13] The extremely long passage of time diminishes the risk that any law enforcement personnel who testified may be subjected to reprisal, although that determination will have to be made on a case-by-case basis in the context of requests for disclosure of specific transcripts. In short, the Court finds that the limited disclosure Goldstein proposes will have no actual impact on any individuals whose status as a witness before the Grand Jury would be revealed. Absent such impact, it is fanciful to imagine that some unknown potential witness in an unknown grand jury proceeding at some unknown time in the future will be deterred from testifying.

██ In weighing the need for secrecy against the need for disclosure, it is essential to consider the nature of Goldstein's case. This is a case brought by someone seeking to establish that as a result of the malfeasance and neglect of prosecutors and police he served 24 years in prison for a crime he did not commit. Goldstein has demonstrated admirable persistence and patience in his pursuit of justice. To withhold the limited information he seeks would be inimical to the purpose of federal civil rights actions and the Court's function as a forum for obtaining the truth.[14] As

---

13. Even before the Grand Jury completed its work, a long list of informants was released by the County DA and published in a newspaper. Mot, Ex. I. The identities of informants have also been revealed through trial testimony, both at criminal trials and at habeas proceedings.

14. Another district court faced with a request for disclosure of materials from a watchdog grand jury made a similar point when it explained the importance of adhering to federal standards for disclosure: "Not only is a federal civil rights action involved, but adoption of a state disclosure standard would allow for

Justice Brennan noted: " 'Grand jury secrecy is, of course, not an end in itself. Grand jury secrecy is maintained to serve particular ends. But when secrecy will not serve those ends or when the advantages gained by secrecy are outweighed by a countervailing interest in disclosure, secrecy may and should be lifted, for to do so in such a circumstance would further the fair administration of criminal justice.' " *U.S. Industries, Inc. v. U.S. Dist. Court for Southern Dist. of Cal., Central Division,* 345 F.2d 18, 21–22 (9th Cir.1965) (quoting *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 403, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959)) (Brennan, J., dissenting). It is apparent in this case that Goldstein's interest in disclosure far outweighs any need to maintain the secrecy of the indexes and summaries that were created in order to facilitate litigants' ability to access the underlying materials in cases of compelling need.

5. *Narrowly tailored disclosure.*

 *Douglas Oil* requires that the disclosure be narrowly tailored so that no more information than is necessary is disclosed. 441 U.S. at 222, 99 S.Ct. 1667. The procedure to be employed in each case may differ. *See id.* at 231, 99 S.Ct. 1667. The Court must necessarily exercise its discretion in fashioning a response that balances the competing considerations implicated in any request for lifting grand jury secrecy. *See id.* at 223, 99 S.Ct. 1667 ("a court called upon to determine whether grand jury transcripts should be released necessarily is infused with substantial discretion").

In this one-of-a-kind case, Goldstein has a compelling need to find out whether any of the witnesses and exhibits in the Grand Jury record correspond to the witnesses and issues at trial. He has shown a high likelihood that they will. Moreover, it would be unfair to require him to go further at this step and seek disclosure of specific transcripts; first he needs to ascertain the names of witnesses and summaries of their testimony. As a solution to this logistical hurdle, the Court finds that a procedure like the one the Superior Court employed in response to Ms. Wefald's request is appropriate in this case.

## IV.

### CONCLUDING OBSERVATIONS AND ORDER

This civil rights action is predicated on law enforcement's misuse of jailhouse informants thirty years ago. Nineteen years ago, the Superior Court of the County of Los Angeles convened a watchdog grand jury to shed light on the problems of the jailhouse informant system. The Grand Jury considered evidence concerning precisely the same issues, the same law enforcement agencies and, it is highly likely, some of the same officers, prosecutors and informants involved in this case. There are very few people who can pursue section 1983 claims that are so precisely matched to a watchdog grand jury's investigation, since very few people succeed in overturning their convictions based on the very prosecutorial misconduct that a watchdog grand jury investigated.

In light of the foregoing reasoning and analysis, the Court GRANTS Plaintiff's motion, vacates the January 22, 2009 Order, and ORDERS as follows.

1. The custodian of records of the records of the 1989–1990 Grand Jury[15] shall re-

---

the possibility that abuses in the state grand jury process [the subject of the special grand jury investigation] could be cordoned off from the probe of federal civil rights actions, depending on the restrictiveness of the state's

disclosure rule." *Urseth v. City of Dayton,* 110 F.R.D. 245, 248 (S.D.Ohio 1986).

**15.** The Court understands the records are housed in the Superior Court Archives at the Los Angeles County Records Center.

lease to this Court the following:

(1) The witness index.

(2) The exhibit index.

(3) The transcript summaries.

These materials shall be filed *in camera* and under seal by March 15, 2009. The custodian shall not provide these materials to any of the parties, but counsel for Superior Court shall serve and file a Notice of Filing. After *in camera* inspection, the Court will determine whether to release the indexes and summaries to counsel. A separate order will issue if the Court discloses the indexes and transcript summaries to counsel.

2. If the Court orders such release, the materials will not be provided to counsel unless all counsel signify their consent to the following restrictions by filing a [Proposed] Protective Order by March 10, 2009:

 a. Until further order, counsel may not give or show these materials to anyone else.

 b. Counsel may not duplicate these materials, except to enable each counsel of record to have one set.

 c. By not later than the conclusion of this case, including any appeal from any final judgment, counsel must return these materials and all copies to counsel for the Superior Court, (The Court may order the return of these materials before then.)

3. Prior to disclosure of any transcripts or exhibits, Plaintiff must establish by motion practice that he has a particularized need for the transcript or exhibit that outweighs any public interest in maintaining its secrecy.

IT IS SO ORDERED.